CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

JUL 1 1 2007

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **DOLLY F. ANDERS,** ) | |
| Plaintiff, ) | Civil Action No. 1:06cv00107 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | By: GLEN M. WILLIAMS |
| **Commissioner of Social Security,**[1] ) | SENIOR UNITED STATES DISTRICT JUDGE |
| Defendant. ) | |

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

The plaintiff, Dolly F. Anders, filed this action challenging the decision of the Commissioner of Social Security, ("Commissioner"), denying the plaintiff's claim for a period of disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

Case 1:06-cv-00107-GMW-PMS   Document 16-2   Filed 07/11/07   Page 1 of 41   Pageid#: 64

the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Anders protectively filed her application for DIB on May 27, 2004, alleging disability as of April 1, 2004,[2] due to nerve damage to the left foot, reflex sympathetic dystrophy, ("RSD"), and pain while standing.[3] (Record, ("R."), at 17, 53-54, 114.) The claim was denied initially and upon reconsideration. (R. at 17, 28-34, 37-39.) Anders then requested a hearing before an administrative law judge, ("ALJ"), and a hearing was held on November 8, 2005, at which Anders was represented by counsel. (R. at 17, 40, 321-346.)

By decision dated April 14, 2006, the ALJ denied Anders's claim. (R. at 14-26.) The ALJ found that Anders met the insured status requirements of the Act for

---

[2] There is a conflict in the record regarding Anders's alleged onset date. Her "Leads/Protective Filing Worksheet" dated May 27, 2004, alleged an onset date of April 1, 2004. (R. at 53.) However, her "Disability Report - Field Office" dated August 24, 2004, indicated an alleged onset date of March 26, 2004. (R. at 111.)

[3] The court notes that, while not alleged in her "Disability Report - Appeal" or "Disability Report - Appeal" filings with the Social Security Administration, ("SSA"), the ALJ more broadly considered Anders's allegations of left lower extremity pain and weakness and depression in rendering his opinion. (R. at 18.)

DIB purposes through the date of the decision. (R. at 18, 24.) The ALJ also found that Anders had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 24.) The ALJ found that the medical evidence established that Anders had severe impairments, namely left lower extremity pain and an affective disorder, but he found that Anders did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24.) The ALJ found that Anders's subjective allegations were not totally credible. (R. at 24.) Based on Anders's age, education and past work history, as well as the testimony of a vocational expert, the ALJ opined that Anders had the residual functional capacity to perform a significant range of sedentary work with some limitations on her concentration due to medications and depression.[4] (R. at 25.) Thus, the ALJ found that Anders was unable to perform any of her past relevant work. (R. at 25.) Nevertheless, based on the testimony of a vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy which Anders could perform, including those of a cashier, an assembler and a packer. (R. at 24-25.) Thus, the ALJ found that Anders was not under a disability as defined in the Act at any time through the date of his decision and was not eligible for DIB benefits. (R. at 24-25.) *See* 20 C.F.R. § 404.1520(g) (2006).

After the ALJ issued his decision, Anders pursued her administrative appeals. (R. at 12.) The Appeals Council denied her request for review on September 8, 2006. (R. at 6-9.) Anders then filed this action seeking review of the ALJ's unfavorable

---

[4] Sedentary work involves lifting items weighing no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* 20 C.F.R. § 404.1567(a) (2006).

decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R §
404.981 (2006). This case is now before the court on Anders's motion for summary
judgment, filed April 17, 2007, (Docket Item No. 11), and the Commissioner's
motion for summary judgment, filed on May 17, 2007, (Docket Item No. 14).

## II. Facts

Anders was born in 1978, which classifies her as a "younger person" under 20
C.F.R. § 404.1563(c) (2006). (R. at 25, 53-54.) Anders received a high school
general equivalency development diploma, ("GED"), and also received her Certified
Nurse's Aide, ("CNA"), certification.[5] (R. at 18, 325.) She has past relevant work
experience as a CNA, a dietary aide and a janitor. (R. at 18, 76-78, 115, 326-27.)

Anders testified at her hearing that she received the injury to her left leg and
foot, which lead to her alleged disability, when she fell while working as a CNA. (R.
at 19, 327-28.) Since this injury, Anders stated that she has continually suffered from
pain and an inability to sit or stand for long periods of time, as well as, depression and
anxiety. (R. at 327-29.) Anders indicated that her pain limited her ability to sit for
more than 20 to 30 minutes and it limited her ability to stand or walk for more than
15 to 20 minutes. (R. at 329.) She testified that she had been treated with
medications, spinal epidural injections and braces. (R. at 329.) Anders recalled being

---

[5] The court notes that Anders, specifically denied completing any special job training,
trade or vocational school on her Disability Report filed with SSA. (R. at 120.) However, she
admitted at her hearing before the ALJ that she received her CNA certification. (R. at 325.)
According to Virginia law, this would have required Anders to "successfully complete[] an
education or training program approved by the [Virginia] Board [of Nursing]." *See* VA. CODE.
ANN. § 54.1-3023 (2006).

Case 1:06-cv-00107-GMW-PMS   Document 16-2   Filed 07/11/07   Page 4 of 41   Pageid#: 67

prescribed medications such as Neurontin, Methadone, Ultram and Ibuprofen. (R. at 330.) She also testified that she spent three to four hours a day with her left leg elevated. (R. at 330.)

In addition to her physical ailments, Anders testified that she had been prescribed Zoloft for depression by her physician, Dr. Ralph D. Brown. (R. at 328, 330.) Anders indicated that she experienced mood swings, crying spells, feelings of being "on edge" and feelings of restlessness. (R. at 330.) She added that she had difficulty resting at night, she had fewer interests, she was not able to socialize as often and she could not concentrate as well as she could prior to her injury. (R. at 330-31.) However, Anders stated that she had not yet been able to see a counselor or receive any treatment other than medication. (R. at 331.)

Anders also testified about her activities of daily living, stating that on a typical day she would wake her children and get them ready for school. (R. at 332.) She would then try to clean the house. (R. at 332.) Following the cleaning, she would rest for a while before getting up to do laundry. (R. at 332.) She would then rest again before preparing supper and eating with her children. (R. at 332.) She stated that after dinner she would help her children with their homework and watch television. (R. at 332.) Anders indicated that she would receive assistance with cooking and cleaning from her mother or her fiancé. (R. at 332, 336.)

Anders stated that she was able to take care of her own personal needs. (R. at 336.) While Anders indicated that she had to stop some of the sporting activities she

used to undertake, she stated that she could still drive. (R. at 333, 336.) She also stated that she was still able to go grocery shopping. (R. at 337.)

John Newman, Ph.D., a vocational expert, testified at Anders's hearing. (R. at 337-45.) Newman asserted that Anders's prior work as a CNA was classified as semi-skilled work that required heavy exertion;[6] however, Newman also indicated that some CNA work was classified as requiring medium exertion.[7] (R. at 340.) Anders's prior work as a dietary aide and a janitor were both classified as unskilled work that required medium exertion. (R. at 340.)

The ALJ asked Newman whether Anders could perform full-time work in a competitive workforce if she were unable to work for three to four hours during various parts of the day, as she claimed. (R. at 340.) Newman stated that she would not be able to undertake full-time employment if that were the case. (R. at 340.) The ALJ then asked Newman if a hypothetical person with the same age, education and work background as Anders, who was restricted to a full range of sedentary work, would be able to perform any sort of full-time employment. (R. at 341.) Newman testified that such an individual could perform jobs existing in significant numbers in the national economy, including those of a cashier, an assembler and a packer. (R. at 341-42.) Newman stated that all of these jobs were sedentary, unskilled jobs, in

---

[6] Heavy work involves lifting objects weighing up to 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can perform heavy work, she can also perform medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(d) (2006).

[7] Medium work involves lifting objects weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can perform medium work he can also perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2006).

Case 1:06-cv-00107-GMW-PMS   Document 16-2   Filed 07/11/07   Page 6 of 41   Pageid#: 69

which a worker could expect to sit at least six hours per day. (R. at 342.)

The ALJ next asked whether the individual would be able to elevate a foot during the course of the day, if needed. (R. at 342.) Newman stated that, if this person were required to prop their foot to heart level, none of these jobs would be available. (R. at 342.) If the person simply was elevating their foot slightly, it was still unlikely that the person could perform one of these occupations with the possible exception of a cashier, who might be able to prop their foot during a slow period of activity. (R. at 342-33.) Newman testified that, with a requirement that a foot be elevated, the jobs of an assembler and a packer would be eliminated entirely and approximately one third or one fourth of the cashier jobs would still be available. (R. at 343.) Newman also testified that the jobs discussed would probably allow a maximum of one absence per month. (R. at 343.)

The ALJ next asked Newman whether the hypothetical individual would be able to perform these same jobs if the individual also suffered from a degree of depression that would impact their job but still allow the individual to perform the job satisfactorily. (R. at 344.) Newman responded that such a mental impairment would not reduce the number of jobs available to an individual because the individual was still able to perform their duties satisfactorily. (R. at 344.) If the individual's impairment was considered severe, such that the individual's job performance would be less than satisfactory, Newman speculated that this impairment could substantially reduce or abolish the number of jobs available to that individual. (R. at 345.)

Case 1:06-cv-00107-GMW-PMS   Document 16-2   Filed 07/11/07   Page 7 of 41   Pageid#: 70

In rendering his decision, the ALJ reviewed records from Dr. Kenneth A. Clark, M.D.; Wake Forest University Baptist Medical Center; Physical Therapy Services; Twin County Regional Hospital; Dr. Robert. B. Stephenson, M.D.; Dr. Paul C. Liebrecht, M.D.; Carilion New River Valley Medical Center; Dr. Ralph D. Brown, M.D.; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Randall Hays, M.D., a state agency physician; R. J. Milan Jr., Ph.D., a state agency psychologist; E. Hugh Tenison, Ph.D, a state agency psychologist; Physiatry Medicine New River Valley, ("Physiatry Medicine"); Alamance Regional Medical Center; and Kristine Donovan, Ph.D., a licensed clinical psychologist. Anders's attorney submitted additional documents to the Appeals Council from Robert C. Miller, Ed.D.; Dr. Jim Griffeth, M.D.; and Dr. Ralph D. Brown, M.D.

Anders claims that her alleged disability stems from an on-the-job injury which occurred in August 2003. (R. at 84, 114, 327-28.) The medical records relevant to her allegedly disabling conditions begin when Anders presented to the emergency room of the Twin County Regional Hospital on August 14, 2003, with complaints that her left foot would not bear weight after a fall caused by her foot getting caught in a cord. (R. at 161.) Anders's records from this emergency visit are only partially legible. However, it is clear that an x-ray was taken of Anders's left foot and examined by Dr. Landon W. Garland, M.D., who stated that "[n]o definite acute fracture [was] demonstrated." (R. at 165.) Dr. Garland also noted that the joint spaces were well maintained and no focal soft tissue swelling was present. (R. at 165.) Thus, Anders was diagnosed with a left foot sprain/contusion, was given Motrin and was told to elevate and apply ice. (R. at 162-64.)

Case 1:06-cv-00107-GMW-PMS   Document 16-2   Filed 07/11/07   Page 8 of 41   Pageid#: 71

On August 15, 2003, the day after her hospital visit, Anders presented to Dr. Paul C. Liebrecht, M.D., at the Orthopedic Care Center, with complaints of left foot and ankle pain resulting from her on-the-job injury. (R. at 195.) Dr. Liebrecht noted that she had a "pretty good" range of motion, mild ankle swelling, mild foot swelling, some tenderness and no neurological symptoms. (R. at 195.) Dr. Liebrecht also noted that her left ankle was stable with no deformities and that her x-rays were unremarkable with no fractures. (R. at 195.) Anders once again was diagnosed with a sprain of the left ankle and foot. (R. at 195.) Anders was given a fracture boot, crutches and restricted to seated, light-duty work. (R. at 195.) Additionally, she was prescribed pain and anti-inflammatory medications. (R. at 195.)

On August 21, 2003, Anders was examined again by Dr. Liebrecht who stated that her examination was "pretty much the same as the last time." (R. at 195.) A bone scan was recommended to rule out occult fracture and Anders was told to progress to full weight-bearing on her left foot as tolerable. (R. at 195.) She remained restricted to light work and was treated for cellulitis purely as a precautionary measure. (R. at 195.) On August 23, 2003, Anders was seen for a follow-up visit and continued to be diagnosed with a sprain of the left ankle with mild dystrophic pain and significant tendinitis. (R. at 194.) Dr. Liebrecht ruled out stress fracture. (R. at 194.)

On August 25, 2003, Dr. Scott A. Raber, M.D., performed a bone scan of Anders's left foot and ankle. (R. at 160.) The scan found chronic left sesamoiditis, which Dr. Raber noted was also present in a June 2000 bone scan. (R. at 160.) No evidence of infection, trauma or tumor were found. (R. at 160, 194.) On August 26,

2003, Dr. Liebrecht noted that Anders may have early RSD, but that her ankle was moving well and there was only "[a] little bit of swelling." (R. at 194.) Dr. Liebrecht instructed Anders to progress in weight bearing and exercise. (R. at 194.) Anders returned on September 2, 2003, at which time Dr. Liebrecht observed that Anders continued to have some tenderness and pain in the left ankle, but her functioning was intact, there was "no real swelling" and she had a "pretty good range of motion." (R. at 193.) On September 5, 2003, Anders continued to complain of left hind foot pain and tenderness. (R. at 193.) Dr. Liebrecht found the medial aspect of Anders's ankle and Achilles' tendon to be intact, and he instructed her to continue with pain and anti-inflammatory medications, as well as to start a two week course of physical therapy. (R. at 193.) Anders also was told to remain on light duty at work for an additional week and a half. (R. at 193.)

Dr. Liebrecht's treatment of Anders continued through the remainder of September 2003. (R. at 191-92.) During this time, Anders persisted in her complaints of medial foot pain and tenderness. (R. at 191-92.) Dr. Liebrecht noted that her ankle moved "pretty well" and that her condition had not changed. (R. at 191-92.) On September 16, 2003, Dr. Liebrecht noted that all her September 10, 2003, magnetic resonance imaging, ("MRI"), performed by Dr. Garland showed was "a little fluid in peroneal tendons on the opposite side of her symptoms," and that the medial structures in the bone looked fine. (R. at 159, 192.) Dr. Liebrecht stated that "I don't have any immediate explanation for the pain that she is having. It is strange. She should be substantially improved at this point." (R. at 192.) Dr. Liebrecht also speculated that Anders could be experiencing some sympathetic dystrophy and continued to restrict her to light duty. (R. at 192.)

-10-

On October 16, 2003, Anders returned to Dr. Liebrecht after an examination by Dr. Robert D. Teasdall, M.D., who she stated had concluded that she had RSD.[8] (R. at 191.) Anders added that Dr. Teasdall concurred on Anders's current course of treatment. (R. at 191.) Anders was given an elastic ankle support and TENS unit and instructed to use the fracture boot only as needed. (R. at 191.) She was directed to continue weight bearing and therapy. (R. at 191.) She was further directed that she could resume light duty work and walk one to two hours a day. (R. at 191.) By October 30, 2003, Anders's foot was feeling slightly better. (R. at 190.) Dr. Liebrecht stated that Anders should be "wean[ed] off [of] the fracture boot" and that she could resume light duty with three to four hours of walking per day. (R. at 190.) Anders was also encouraged to work through the pain more and to continue physical therapy. (R. at 190.)

During October and November 2003, Anders was seen by Twin County Regional Healthcare on at least three occasions with complaints of left foot and ankle pain.[9] (R. at 153-56.) During her October visits, Anders appears to have received two epidural steroid injections intended to treat her left foot and ankle pain. (R. at 153-56.) Anders's medical records appear to indicate that she did not receive

---

[8] The court notes that the only record of a medical visit to Winston-Salem, North Carolina, by Anders occurred on September 4, 2003. (R. at 134-35.) At this time, it appears that Anders was seen by Dr. David S. Chang, M.D., and Dr. Teasdall, for a follow-up examination of her surgically repaired right ankle. (R. at 134-35.) At this visit Dr. Teasdall did not diagnose Anders with RSD in either her left or right ankle. (R. at 134-35.) As a result, there is no record provided from Dr. Teasdall in which he ever diagnosed Anders with RSD.

[9] Anders's records from Twin County Regional Healthcare, to the extent that they are handwritten and not typed, are largely illegible and are only sporadically dated. (R. at 148, 152-56.)

Case 1:06-cv-00107-GMW-PMS Document 16-2 Filed 07/11/07 Page 11 of 41 Pageid#: 74

complete pain relief from the injections.  (R. at 153.)   The records of Anders's
November 2003 visit demonstrate that she had no change in her pain and that she was
prescribed different pain medication.  (R. at 152.)

When Anders saw Dr. Liebrecht in November 2003, Anders noted some
improvement in her foot.  (R. at 189.)  Dr. Liebrecht stated that Anders's foot
examination was basically the same and that she could continue working. (R. at 189.)
She was instructed to perform regular work for four hours per day and perform light
duty work for four hours per day.  (R. at 189.)  Additionally, by December 2003, Dr.
Liebrecht indicated that Anders's foot had improved and she was returned to full duty
work.  (R. at 188.)

Anders continued to see Dr. Liebrecht and in January 2004 again reported pain
in her left foot.  (R. at 187.)  On January 22, 2004, Anders also complained of pain
and swelling in her calf.  (R. at 187.)  As a result, Anders was prescribed knee-high
support hose.  (R. at 187.)  Dr. Liebrecht then consulted with Dr. Griffeth about other
potential treatments for Anders's foot pain.  (R. at 187.)  Dr. Griffeth noted that a
spinal block performed on Anders should have completely eliminated Anders's pain,
and the fact that it did not "suggested that there [was] some non-physiological
mechanism here, to some extent."  (R. at 187.)  Dr. Liebrecht had a Doppler
ultrasound performed on Anders to rule out any deep vein thrombosis, ("DVT"); he
also ordered a bone scan of Anders's feet and ankles.  (R. at 150-51, 186-87.)  The
Doppler ultrasound was negative for DVT and the bone scan resulted in an
impression of gait related changes versus post-traumatic osteoarthritis of the talar
domes.  (R. at 150-51, 186.)  On January 29, 2004, Anders again was restricted to

-12-

light duty work for three weeks and then instructed to resume regular work duties in February. (R. at 185-87.)

In February 2004, Anders was seen for a second opinion regarding her left foot and ankle pain by Dr. Robert B. Stephenson, M.D. (R. at 182-83.) Dr. Stephenson noted that Anders appeared healthy with a slow antalgic gait on the left side. (R. at 182.) Upon examination of her left foot and ankle, he found mild diffuse swelling and diffuse, variable tenderness. (R. at 182.) Dr. Stephenson noted stable ankle ligaments, intact tendon function, normal skin tone, normal heel alignment, normal arch alignment and no tenderness. (R. at 182.) A motor/sensory/vascular exam found these aspects to be intact and a normal callous pattern was noted on the plantar aspect of the left foot. (R. at 182.) Dr. Stephenson had new x-rays taken of Anders's left ankle which showed no degenerative changes, no evidence of acute or previous trauma, no evidence of degeneration or avascular necrosis and no evidence of osteopenia. (R. at 183.) Additionally, the x-rays demonstrated a normal talar dome and normal bone density. (R. at 183.) As a result, Dr. Stephenson noted an impression of chronic left ankle and foot pain likely related to chronic regional pain syndrome or RSD. (R. at 183.)

Dr. Stephenson also stated that "I do feel that there is evidence of symptom magnification as well." (R. at 183.) He also noted that his examination and testing documented evidence against classic RSD including the normal callous pattern on her foot, the fact that there was no skin tightness or atrophic change and the fact that Anders had a recent bone scan that was "essentially normal." (R. at 183.) This bone scan was compared to the x-rays he had taken and he specifically found that there was

-13-

no post traumatic osteoarthritis or osteopenia. (R. at 183.) Dr. Stephenson recommended that Anders be "wean[ed] out" of her walking boot and encouraged to undertake as much activity with the left ankle as possible. (R. at 183.) She was instructed to continue with the TENS unit, medications and exercises. (R. at 183.) She also was "strongly recommended" to return to light duty work to prevent ongoing debilitation. (R. at 183.) Dr. Stephenson finally found that her treatment and care up to this point had been appropriate and should continue. (R. at 183.)

On March 16, 2004, Anders returned to Dr. Liebrecht and a follow-up x-ray of her left foot was performed. (R. at 185.) With respect to the x-ray, Dr. Liebrecht stated "I don't see anything happening there. No periosteal reaction. Nothing to suggest a stress fracture. There is no patchy osteoporosis suggesting RSD. The joint space is maintained." (R. at 185.) Dr. Liebrecht stated that Anders should continue regular work and stop all of her medication. (R. at 185.) He further stated that she was "just going to have to live with this." (R. at 185.)

Anders last saw Dr. Liebrecht in April 2004 and complained of increased foot pain. (R. at 184.) Dr. Liebrecht noted some diffuse tenderness and on April 1, 2004, prescribed no work for two weeks. (R. at 184.) On April 15, 2004, Anders reported some improvement after missing work and Dr. Liebrecht prescribed another four weeks without work. (R. at 184.) Anders was instructed to return in four weeks for re-examination, which never occurred. (R. at 184.)

Additionally, during the period of Dr. Liebrecht's treatment of Anders, the record contains notes from Physical Therapy Services regarding treatment received

-14-

by Anders from September 18, 2003, through January 1, 2004. (R. at 138-44.) Her initial visit on September 18, 2003, was for treatment of her September 14, 2003, left ankle sprain. (R. at 143.) Anders was found to be independent in ambulation with a fracture boot and crutches. (R. at 143.) The attending therapist, Franklin B. Isom, noted that she had mild swelling and discoloration as well as quite a bit of tenderness and little range of motion. (R. at 143.) She was instructed to apply heat, elevate her foot and move the ankle to increase mobility while at home. (R. at 143.) She was treated with moist heat and phonophoresis using ultrasound and cortisone cream. (R. at 143.)

Anders continued physical therapy from September 2003 through November 2003 for her repeated complaints of ankle pain. (R. at 138-43.) At these appointments, Anders received treatment on the ankle which she tolerated "well." (R. at 138-43.) On January 29, 2004, the last record of Anders being treated at Physical Therapy Services, she again claimed that "she saw Dr. Teasdale [sic] in Winston and [was] told she had RSD." (R. at 138.)

Anders presented to Dr. Ralph Brown Jr., M.D., on May 4, 2004, based on a referral from Dr. Liebrecht.[10] (R. at 201-04.) A physicial examination documented moderate discomfort with significant pain to stimulation of the left foot and a lower leg with an antalgic gait. (R. at 202.) Dr. Brown noted that Anders's pain was worse after standing for prolonged periods of time and elevation alleviated the pain. (R. at 201.) However, her strength was found to be appropriate and her reflexes were

_____

[10] Dr. Brown's handwritten notes of his early treatment and examination of Anders are largely illegible.

-15-

symmetrical. (R. at 202.) He also noted that she received 50 percent pain relief with the use of a Lidocaine patch. (R. at 201.) Based on her complaints, Dr. Brown diagnosed Anders with complex regional pain syndrome, ("CRPS"), Type I.[11] (R. at 201, 204.) Anders was prescribed "a PLO gel with ketamine, Neurotin and Lidocaine." (R. at 202.) Dr. Brown also recommended Vicodin and retraining in a job where she did not have to stand on her feet all day. (R. at 202.)

Dr. Brown noted that Anders was very pleasant at the time of his examination and her mood was normal. (R. at 202.) He found that her mental status was intact and that her "[c]ognition and memory [were] appropriate [in] affect, actually, at this time in spite of her complaints." (R. at 202.) However, based solely on her subjective complaints that she was depressed with crying spells, Dr. Brown diagnosed her with depression and prescribed Paxil. (R. at 201-02, 204.)

Anders was next treated by Dr. Brown on June 29, 2004, primarily for continued complaints of left lower extremity pain. (R. at 200.) Dr. Brown noted that Anders was "doing about [the] same." (R. at 200.) He stated that sympathetic blocks were of no help, but that the PLO provided some help. (R. at 200.) Dr. Brown noted that Anders's mood had declined. (R. at 200.) He also noted that Anders did not think that Paxil was working, despite documenting that Anders admitted that she had not been taking this medication on a daily basis as prescribed. (R. at 200.) Despite

---

[11] CRPS Type I was previously known as RSD and refers to unexplained burning pain that results after an injury or illness that did not cause any nerve damage to the affected limb. *See* MAYO CLINIC, COMPLEX REGIONAL PAIN SYNDROME (April 2, 2007), http://www.mayoclinic.com/print/complex-regional-pain-syndrome/DS00265/DSECTION=all&METHOD=print.

-16-

this admission, Dr. Brown increased her dosage of Paxil, continued her other medications and gave her a work release until her next visit. (R. at 200.)

On August 18, 2004, Dr. Brown noted that Anders's symptoms remained the same and that she continued to experience moderate discomfort. (R. at 199.) An MRI of Anders's lumbar spine was performed in an attempt to explain her complaint of left foot numbness. (R. at 196-99.) Dr. Brown noted that the MRI was negative for any problems with Anders's lumbar spine. (R. at 199.) Additionally, Dr. Brown indicated that the PLO was no longer helping and removed this from Anders's treatment plan. (R. at 199.) Dr. Brown's treatment plan is not entirely legible but it is apparent that he prescribed some type of insert, Zonegran and increased her dosage of Lortab. (R. at 199.) Dr. Brown also suggested that a Bier block could be attempted in the future. (R. at 199.) Additionally, Dr. Brown noted that Anders's mood may have declined and, as a result, prescribed Prozac and psychology. (R. at 199.)

In September and October 2004, Anders had a custom-mold foot orthosis for the treatment of sesamoiditis fabricated based on a prescription from Dr. Brown. (R. at 205-07, 210.) Also in October 2004, Anders records were transferred by Dr. Brown to Physiatry Medicine. (R. at 238.) On October 12, 2004, Anders was seen at Physiatry Medicine by Dr. Trevar O. Chapmon, M.D., instead of Dr. Brown. (R. at 240, 287.) Dr. Chapmon noted that Anders continued to experience moderate lower left extremity pain. (R. at 240, 287.) However, he also noted that she "[h]as gotten some relief with med[ication]s," and that "[p]ain medications allow patient to perform [activities of daily living] and responsibilities at home." (R. at 240, 287.)

-17-

Dr. Chapmon found Anders to be alert and oriented with normal cognition and memory. (R. at 241, 288.) Her mood was documented to be appropriate to the situation. (R. at 241, 288.) Anders's left foot was found to have mild swelling around the dorsum and the ankle. (R. at 241, 288.) Anders's diagnoses continued with the addition of neuralgia/neuritis not otherwise specified. (R. at 241, 288.) She was continued on Prozac and Lortab with an increase in her Zonegran. (R. at 241-42, 288-89.) Finally, Anders was instructed to start working on improving her range of motion and strengthening her left ankle. (R. at 241-42, 288-89.)

Dr. Brown again saw Anders at Physiatry Medicine on October 25, 2004, for continued complaints of left lower extremity pain. (R. at 234, 283.) At this visit, Anders's medications were noted to be providing some relief, but not complete relief. (R. at 234, 283.) Dr. Brown found Anders to be alert and oriented with an appropriate mood; however, Dr. Brown continued to diagnose Anders with depression. (R. at 235-36, 284-85.) Additionally, Dr. Brown noted that Anders's left lower extremity was discolored and tender with moderate pain. (R. at 235, 284.) He continued to diagnose CRPS, neuralgia/neuritis not otherwise specified and chronic pain, deteriorated. (R. at 236, 285.) Anders was prescribed Ibuprofen, Zonegran, Methadone and left ankle foot orthotic, (R. at 236, 285); however, no record has been provided that documents whether Anders ever pursued the ankle foot orthosis prescribed by Dr. Brown. Anders was restricted from returning to work until December 16, 2004. (R. at 282.)

Pursuant to a referral from Dr. Brown, Anders was seen on December 20, 2004, by Dr. Francisco A. Naveria, M.D., to determine whether she was a candidate for

-18-

peripheral nerve blocks. (R. at 252.) Dr. Naveria indicated that upon examination Anders was alert, oriented and in no apparent distress despite describing her pain level as a nine on a scale of one to ten. (R. at 252, 254.) Anders was found to ambulate without any assistance and to be capable of self-care. (R. at 254.) Her feet were both of a normal color, but there was some tenderness to palpation over the left ankle area. (R. at 254.) Anders was assessed to have left ankle pain, CRPS Type I, left lower extremity non-dermatomal pain and depression. (R. at 254.) Dr. Naveria indicated that he could perform a left-sided lumbar sympathetic block; however, he noted that this recommendation was pending a nerve conduction test to determine if any true peripheral blocks were necessary. (R. at 254-55.)

Anders next saw Dr. Naveria on February 2, 2005, after she had received a left-sided lumbar sympathetic block. (R. at 250-51.) Anders informed Dr. Naveria that she received no pain relief from this procedure. (R. at 250.) Dr. Naveria noted that Anders was alert, oriented and appeared to be in no acute distress. (R. at 250.) He further noted that her lower extremity range of motion and strength appeared to be grossly intact for her age and physical status. (R. at 250.) Dr. Naveria indicated that he discussed the possibility of a spinal cord simulator with Anders. (R. at 250.)

On February 7, 2005, Anders was again seen by Dr. Brown. (R. at 277-79.) Dr. Brown noted that Anders's left lower extremity pain continued. (R. at 277-78.) Dr. Brown indicated that Anders "complains of depression" that increased with stressors and family tragedies, but that Anders any experiencing any mood changes or hallucinations. (R. at 277-78.) Upon physical examination, Anders was found to be alert and oriented with normal cognition and memory. (R. at 278.) Dr. Brown

-19-

noted that the status of Anders's diagnosis of depression was unchanged. (R. at 279.)

Dr. Brown evaluated Anders's pain to be moderate and noted that medications eased the pain to some degree. (R. at 278.) He noted that her pain was exacerbated by prolonged standing or walking and noted that she had been out of her prescribed Methadone since December. (R. at 278.) Her gait was described as antalgic and she experienced left foot drop. (R. at 278.) Dr. Brown noted that Anders's pain related diagnoses were unchanged. (R. at 279.)

On April 11, 2005, Anders was seen at Physiatry Medicine by Lisa K. Salyards, P.A., whose examination was also signed by Dr. Brown. (R. at 272-74.) Anders indicated that her pain remained the same and that it was an eight out of ten at the time of examination. (R. at 272.) Anders's left lower extremity was tender to palpation, but she was found to be in only mild discomfort. (R. at 273.) Anders's diagnoses remained unchanged. (R. at 274.) It was further noted that Anders's left foot pain was consistent with CRPS Type I and that an EMG/NCS had been performed which ruled out Type II. (R. at 274.) Additionally, Anders was negative for peroneal neuropathy. (R. at 274.) With respect to her mental complaints, Anders was found to be alert and oriented with normal cognition and memory. (R. at 273.) Furthermore, her mood was appropriate to the situation. (R. at 273.)

Anders returned to Physiatry Medicine on May 10, 2005, with complaints that her pain had migrated into her left hip and was now an eight or nine out of ten on an average day. (R. at 266.) She was noted to be in no discomfort and the only left

-20-

lower extremity discomfort documented was left hip pain. (R. at 267.) Her gait remained antalgic. (R. at 267.) Anders continued to be found to be alert and oriented with an appropriate mood. (R. at 267.) Anders stated that her depression was "slightly better" and, as a result, Anders's depression was diagnosed as improved. (R. at 268.) However, Salyards found Anders's CRPS, neuralgia/neuritis not otherwise specified and her chronic pain to have deteriorated. (R. at 268.) Salyards indicated that she thought that Anders's gait might be causing trochanteric bursitis and recommended physical therapy. (R. at 264, 268.)

A physical assessment of Anders was prepared by Dr. Brown on May 10, 2005.[12] (R. at 307-20.) It is clear that Dr. Brown's assessment claims that Anders is limited in her ability to lift/carry and stand/walk; however, Dr. Brown does not indicate the degree of these limitations. (R. at 318.) He indicates a limitation in Anders's ability to sit and states that she can only sit for three hours in an eight hour day and only sit for one hour at a time. (R. at 319.) Dr. Brown also found that Anders could not climb, stoop, crawl, crouch, kneel, reach or push/pull due to her impairments. (R. at 319.) Dr. Brown also found limitations with respect to heights, moving machinery, temperature extremes and vibration. (R. at 320.) Finally, he opined that Anders would likely miss more than two days of work per month. (R. at 320.) To support these findings, Dr. Brown consistently referenced Anders's medical records. (R. at 318-20.)

---

[12] The court notes that Dr. Brown's notations on this assessment are not entirely legible. Additionally, the plaintiff claims that this report was submitted to the Office of Hearings and Appeals, ("OHA"), on May 24, 2005. (R. at 309.) However, the record in this case indicates that this report was not submitted until June 23, 2006, to the Appeals Council. (R. at 308-20.) For the purposes of this court's review, the plaintiff shall be given the benefit of the doubt that this report was submitted to the OHA.

On July 11, 2005, Anders was again seen by Physiatry Medicine and again complained of increased pain in her left leg and foot, but not her left hip. (R. at 258.) Anders described her pain as a nine out of ten and stated that the pain was so bad that it had made her queasy. (R. at 258.) Anders also stated that her mood had decreased because of the pain. (R. at 258.) However, Salyards noted that she "was able to observe her walk into the building and into the office[,] she was smiling and did not appear to be in pain at that time." (R. at 258.) She also stated that "[s]he did not appear to me[,] with watching her walk into the office[,] that she was having difficulty–she also did not appear to show pain with facial expression or with antalgic stepping." (R. at 260.)

Salyards continued to note that Anders was alert and oriented with an appropriate mood. (R. at 259.) Additionally, Salyards's physical examination continued to document that Anders experienced no discomfort and no tenderness to palpation in her left foot. (R. at 259-60.) Salyards did note that Anders experienced some pain when Dr. Brown performed dorsi flexion. (R. at 260.) Salyards recommended, with Dr. Brown's approval, that Anders be removed from Methadone and that she stop wearing her brace because it was unnecessary. (R. at 260.) The records indicate a finding that all of Anders's bone scans had been negative and her EMG/NCS testing did not indicate peroneal neuropathy. (R. at 260.) Additionally, Type II CRPS and foot drop had been ruled out. (R .at 260.) Instead, Salyards and Dr. Brown concluded that her pain may be stemming from her not being able to move her foot as much as was needed due to her use of her brace. (R. at 260.) Finally, on July 21, 2005, another bone scan was performed which again documented no problems. (R. at 256.)

-22-

Anders returned to Physiatry Medicine on October 4, 2005, with complaints of left lower extremity pain and depression. (R. at 304.) She claimed that pain in her left foot and left knee was a nine out of ten. (R. at 305.) However, once again she was found to be alert and oriented with a mood appropriate to the situation. (R. at 305.) She also was found to have an antalgic gait, tenderness in her left foot, but was found to be in no discomfort. (R. at 305.) Her diagnoses were all listed as deteriorated except her gait disturbance, which was listed as unchanged. (R. at 306.) Anders was recommended to increase walking to build dorsi flexion in her foot, to continue the Zoloft, which she had only been taking for a week, and to visit another doctor for depression. (R. at 306.)

Anders returned to Dr. Brown on January 10, 2006, for a follow-up visit. (R. at 301-03.) She was found to be alert and oriented with a decreased mood. (R. at 302.) She complained that her pain was an eight out of ten and she had tenderness in her left upper extremity and left foot. (R. at 302.) Dr. Brown found that her diagnoses had all deteriorated noting that her depression had gotten worse. (R. at 306.) She was instructed that she needed to continue building strength to improve her gait and he recommended a spinal simulator. (R. at 302.)

A Physical Residual Functional Capacity Assessment, ("PRCF"), was completed on November 3, 2004, by Dr. Richard M. Surrusco, M.D., a state agency physician. (R. at 212–18.) He found that Anders could occasionally lift and/or carry items weighing up to 20 pounds, could frequently lift and/or carry items weighing up to 10 pounds, could stand and/or walk for a total of approximately two hours in an eight-hour workday, could sit for a total of about six hours in an eight-hour workday

-23-

and was limited only in her ability to push and/or pull in her left lower extremity. (R. at 213.) He also opined that Anders occasionally could climb, balance, stoop, kneel, crouch and crawl. (R. at 214.) Anders was found to have no manipulative, visual, communicative or environmental limitations. (R. at 214-15.) Dr. Surrusco specifically found that, based on the evidence, Anders's complaints were partially credible and that her treatment for chronic left lower extremity pain and CRPS had been "essentially routine and conservative in nature." (R. at 216.) Dr. Surrusco also noted that in February 2004, Dr. Stephenson had "strongly recommended" that Anders return to light duty work and that in October 2004 the claimant still had the ability to perform work in a seated position. (R. at 218.) He also noted her activities of daily living. (R. at 216.) Dr. Surrusco's assessment was affirmed by Dr. Randall Hays, M.D., another state agency physician, on February 11, 2005. (R. at 217.)

A Psychiatric Review Technique Form, ("PRTF"), was completed on November 3, 2004, by R. J. Milan Jr., Ph.D., a state agency psychologist. (R. at 219-31.) Milan found that Anders suffered from an affective disorder, but this mental impairment was not severe. (R. at 219.) More specifically, Milan noted that Anders suffered from depression that did not precisely satisfy the diagnostic criteria. (R. at 222.) Anders was found to have no limitation in her activities of daily living, maintaining social functioning, maintaining concentration, maintaining persistence, maintaining pace and no episodes of decompensation were found. (R. at 229.) Furthermore, Milan specifically noted Anders's activities of daily living and the fact that, in October 2004, she was found to be alert and oriented with no loss of cognition or memory and an appropriate mood. (R. at 231.) As a result, Milan found that her alleged mental impairment was not severe. (R. at 231.) This assessment was affirmed by E. Hugh Tenison, Ph.D., another state agency psychologist, on February

-24-

11, 2005. (R. at 217.)

On February 7, 2005, a psychological evaluation on Anders was performed by Kristine Donovan, Ph.D., a licensed clinical psychologist, upon referral by Dr. Brown. (R. at 290-93.) Donovan noted that Anders currently met the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition,* ("DSM-IV"), criteria for major depressive disorder, single episode, (chronic), moderate. (R. at 290.) She was administered the Beck Depression Inventory, ("BDI-II"), and scored within the moderate range. (R. at 290.) Donovan indicated that Anders's depression stemmed from her complaints of pain and, while nothing had eliminated the pain, her medications were useful at easing the pain. (R. at 290-91.) Donovan also stated that "Dr. Brown's note indicate[s] that he feels that she can do light duty work, with no lifting over 25 [pounds], and limited walking (allow sitting breaks)." (R. at 291-92.)

Donovan noted that Anders drove herself 45 minutes to the appointment and sat comfortably in her chair for the 60-minute interview. (R. at 292.) She was alert and oriented with a mildly depressed mood and a flexible affect. (R. at 292.) Donovan found her to be cooperative and found no evidence of a formal thought disorder. (R. at 292.) Anders's attention was found to be good based on her performance of serial seven additions and no memory deficits were noted. (R. at 292.) Donovan assessed her Global Assessment of Functioning, ("GAF"), score to be 60.[13] (R. at 293.) Anders was recommended to undergo cognitive-behavioral therapy for depression and pain management. (R. at 293.)

---

[13] A GAF of 51-60 indicates that an individual has "[m]oderate symptoms . . . Or moderate difficulty in social, occupational or school functioning. . . ." DSM-IV at 32. However, a GAF of 61-70 indicates that and individual has "[m]ild symptoms." DSM-IV at 32.

On November 2, 2005, Anders was examined by Robert C. Miller, Ed.D., a licensed clinical psychologist, at the request of her attorney. (R. at 295-97.) Miller concluded that Anders established a fair rapport and appeared to be providing a fair effort. (R. at 296.) She arrived at her appointment using a cane to support her left side, but "no signs of distress were observed during the evaluation." (R. at 296.) Her mood was found to be anxious and pessimistic with a flat affect. (R. at 296.) Miller noted signs of a generalized anxiety disorder. (R. at 296.) Anders attempted serial three additions and eventually stopped after 30 when she became confused, but she was able to complete a simple simulated purchase. (R. at 296.) Her intellectual functioning was found to be borderline to below average. (R. at 296.) Miller stated that he performed the Miller Forensic Assessment of Symptoms Test, ("M-FAST"), and that the results confirmed that Anders was not malingering; however, no test results were documented. (R. at 296.) She was diagnosed with major depressive disorder, mild and generalized anxiety disorder and was given a GAF score of 50.[14]

Miller also completed a mental assessment form of Anders's ability to do work related activities on November 2, 2005. (R. at 298-99.) On this form Miller found that Anders had a fair ability to follow work rules, use judgment with the public and function independently. (R. at 298.) He also found Anders had a poor ability to relate to co-workers, deal with the public, interact with supervisors, deal with work stresses and maintain attention/concentration. (R. at 298.) However, when asked to "describe any limitations and include the medical findings to support this assessment," Miller provided nothing. (R. at 298.) Miller indicated that no other work activities were impacted by Anders's impairment and found that she could

---

[14] A GAF score of 50 indicates "[s]erious symptoms . . . Or any serious impairment in social occupational or school functioning. . . ." DSM-IV at 32.

manage benefits in her own interest. (R. at 299.) Finally, he checked the box indicating that he anticipated that she would miss more than two days of work per month. (R. at 299.)

The plaintiff submitted additional evidence to the Appeals Council consisting of a letter from plaintiff's attorney, a curriculum vita for Robert C. Miller, a letter from Dr. Jim Griffeth, M.D., dated March 8, 2004, and a physical assessment from Dr. Brown dated May 10, 2005.[15] (R. at 307-320.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520 (2006).

---

[15] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 7-11), this court also will consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F. 2d 93, 96 (4th Cir. 1991). Additionally, as discussed earlier, the May 10, 2005, report of Dr. Brown will be reviewed as a piece of evidence before the ALJ.

-27-

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated April 14, 2006, the ALJ denied Anders's claim. (R. at 14-26.) The ALJ found that Anders met the insured status requirements of the Act for DIB purposes through the date of the decision. (R. at 18, 24.) The ALJ also found that Anders had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 24.) The ALJ found that the medical evidence established that Anders had severe impairments, namely left lower extremity pain and an affective disorder, but he found that Anders did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24.) The ALJ found that Anders's subjective allegations were not totally credible. (R. at 24.) Based on Anders's age, education and past work history, as well as the testimony of a vocational expert, the ALJ opined that Anders had the residual functional capacity to perform a significant range of sedentary work with some limitations on her concentration due to medications and depression. (R. at 25.) Thus, the ALJ found that Anders was unable to perform any of her past relevant work. (R. at 25.) Nevertheless, based on the testimony of a vocational expert, the ALJ found that other jobs existed in significant numbers in the national

-28-

economy which Anders could perform, including those of a cashier, an assembler and a packer. (R. at 24-25.) Thus, the ALJ found that Anders was not under a disability as defined in the Act at any time through the date of his decision and was not eligible for DIB benefits. (R. at 24-25.) *See* 20 C.F.R. § 404.1520(g) (2006).

The plaintiff argues that the ALJ's decision is not supported by substantial evidence and that the Commissioner has not met his evidentiary burden to identify jobs consistent with the claimant's age, education and work history. (Brief In Support of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 5.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided that his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439–40 (4th Cir. 1997).

While an ALJ may not reject medical evidence for no reason or for the wrong reason, see *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

-29-

Anders argues that the ALJ's determination that she is not disabled is not supported by substantial evidence. (Plaintiff's Brief at 5-11.) With respect to the claimant's alleged physical impairments, the claimant disagrees with the ALJ's usage of the records of Dr. Liebrecht and Dr. Stephenson, two treating sources. (Plaintiff's Brief at 6-7.) The claimant also argues that the records of Dr. Brown indicate that the claimant did not have the ability to perform sedentary work activity. (Plaintiff's Brief at 7-8.) These arguments are without merit.

First, the plaintiff alleges that the bulk of Dr. Liebrecht's treatment occurred prior to Anders's claimed date of disability and, thus, is irrelevant. (Plaintiff's Brief at 6.) Despite the previously noted conflict in the record regarding the plaintiff's onset date of disability, Anders claims disability arising in either late March or early April of 2004 stemming from her August 2003 injury. (R. at 114, 327-28.) Specifically, Anders completed and signed a pain questionnaire submitted to SSA on September 20, 2004, stating that she had been experiencing the pain that limited her activities "since August of 2003[,] 8-14-2003," the date of her injury at work. (R. at 84.) Furthermore, she stated on her Disability Report submitted to the SSA that her disabling condition first began to bother her on August 14, 2003. (R. at 114.) As a result, the records of Dr. Liebrecht and Dr. Stephenson, two of her treating physicians after this fall, are directly relevant to her claimed disability. Furthermore, Dr. Liebrecht's treatment continued into the period of Anders's claimed disability. (R. at 184.)

The findings of Dr. Liebrecht and Dr. Stephenson lend substantial support to the ALJ's determination that Anders was not disabled. In addition, the findings of

-30-

Dr. Liebrecht and Dr. Stephenson are substantiated by numerous other medical records, which provide substantial evidence in support of the ALJ's decision. For example, on December 20, 2004, February 2, 2005, April 11, 2005, May 10, 2005, July 11, 2005, and October 4, 2005, treating sources examined Anders and found her to be in mild distress or no distress despite complaints of constant pain that she estimated to be an eight or nine on a ten point scale. (R. at 250, 252, 254, 267, 273, 258-60, 305.). Additionally, Anders's records from Physiatry Medicine included explicit notes indicating that Anders was able to walk without any apparent pain, apparent distress or antalgic stepping. (R. at 258-60.) These observations were made by a Physiatry Medicine staff member immediately before Anders entered the doctor's office and complained of debilitating pain. (R. at 258.) In this court's opinion, the objective findings by Anders's treating sources, including the relevant records of Dr. Liebrecht and Dr. Stephenson, are consistent with the state agency physicians's findings and provide substantial evidence to support the ALJ's decision with respect to Anders's alleged physical impairments.

Additionally, Dr. Brown's May 10, 2005, report, which was heavily relied upon by the claimant in her brief, is of little probative value and does not contradict the ALJ's decision. The findings in this report are not supported by any documentary medical evidence. Instead, the report merely refers back to Dr. Brown's medical records, which actually do not support his conclusions on this form. As written, this form merely indicates that Dr. Brown believed that Anders's impairments caused in some impact on her ability to lift/carry and stand/walk. (R. at 318.) However, Dr. Brown did not indicate the degree of this limitation on the form. (R. at 318.)

Case 1:06-cv-00107-GMW-PMS   Document 16-2   Filed 07/11/07   Page 31 of 41   Pageid#: 94

Moreover, Dr. Brown's records and the objective records of Physiatry Medicine specifically contradict a finding of any limitation on Anders's ability to stand/walk. On May 10, 2005, the same date Dr. Brown completed his assessment, a physical examination of Anders found her to be in no discomfort. (R. at 267.) Then on July 11, 2005, Anders's very next visit, Salyards noted that she "was able to observe [Anders] walk into the building and into the office[,] she was smiling and did not appear to be in pain at that time." (R. at 258.) Salyards also reported that "[s]he did not appear to me[,] with watching her walk into the office[,] that she was having difficulty—she also did not appear to show pain with facial expression or with antalgic stepping." (R. at 260.) Thus, Dr. Brown's finding is not consistent with substantial evidence in the record.

Dr. Brown's May 10, 2005, assessment form stated that Anders was limited by her impairment in her ability to sit for more than three hours in an eight hour day and that she could only sit for one hour at a time. (R. at 319.) As with all of the findings on Dr. Brown's assessment, the only support for this determination was a reference to Dr. Brown's treatment notes. (R. at 319.) However, there are no objective medical findings in any of Dr. Brown's treatment notes indicating that Anders was limited in her ability to sit. In fact, the treatment records from Physiatry Medicine consistently state that Anders's pain was exacerbated by extended periods of walking or standing, not sitting. Again, Dr. Brown's finding is not consistent with substantial evidence in the record.

Furthermore, Dr. Brown's finding that Anders could never stoop, from his May 10, 2005, assessment form, is specifically highlighted by the claimant in her brief.

-32-

The claimant references the inability to stoop as a basis for her argument that the ALJ's decision that she could perform sedentary work activity is not supported by substantial evidence. (Plaintiff's Brief at 8.) To stoop is defined as "to bend the body forward and downward sometimes simultaneously bending the knees." WEBSTER'S NEW COLLEGIATE DICTIONARY 1146 (9th ed. 1990). By definition "stooping" does not require any bending at the ankle or foot, Anders's primary areas of complaint throughout her medical records. Although she complained of left hip pain on May 10, 2005, by July 11, 2005, she was once again complaining solely of left foot pain. (R. at 258, 266.) Thus, the assertion that Anders could never stoop, from Dr. Brown's assessment form, is not supported by the substantial objective medical evidence.

The plaintiff cites Social Security Ruling 96-9p, for the proposition that if a person is unable to stoop, that individual cannot perform the duties of an unskilled sedentary worker and, thus, should usually be considered disabled. (Plaintiff's Brief at 8.) However, because Dr. Brown's finding that Anders could never stoop from his May 10, 2005, assessment form is inconsistent with the objective medical evidence in the record, it is unnecessary for this court to evaluate this argument.[16]

The plaintiff also argues that there is no evidence in the record to contradict Dr. Brown's opinion regarding Anders's physical capacity since her alleged onset of

---

[16] This court does note that 20 C.F.R. § 404.1567(a), defines sedentary work without any reference to a claimant's ability to stoop and clearly does not indicate that a claimant's inability to stoop would preclude the claimant from undertaking unskilled sedentary work. Thus, even if Dr. Brown's finding regarding Anders's ability to stoop were supported by substantial evidence in the record, Social Security Ruling 96-9p would not provide any basis for this court to find that the ALJ's decision was not supported by substantial evidence. *See Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995) (stating that a Social Security Ruling is entitled to deference unless it is clearly erroneous or inconsistent with the law).

-33-

disability. (Plaintiff's Brief at 8.) This is clearly incorrect. As just discussed, the record as a whole does not support Dr. Brown's conclusions in his May 10, 2005, report. Besides the records of Dr. Liebrecht and Dr. Stephenson, Dr. Brown's own records, the records of others at Physiatry Medicine and the opinion of the state agency physicians all contradict Dr. Brown's May 10, 2005, assertions.

This contradiction is readily apparent just by examining Anders's records from the dates surrounding the completion of Dr. Brown's May 10, 2005, assessment. Upon physical examination at Anders's April 11, 2005, visit to Physiatry Medicine, she was found to be in only mild discomfort despite complaints of pain grade of eight out of ten. (R. at 273.) At her May 10, 2005, visit, Anders was found upon physical examination to be in no discomfort despite complaints of a pain grade of nine out of ten. (R. at 267.) Furthermore, Anders's very next visit to Physiatry Medicine following the completion of Dr. Brown's May 10, 2005, report on July 11, 2005, clearly contradicts Dr. Brown's findings. (R. at 258-60.) As discussed above, in July 2005, Salyards observed Anders walking into the doctor's office smiling without any sign of difficulty, pain or antalgic stepping; yet she then proceeded to complain of pain so intense that it made her queasy. (R. at 258-60.) Thus, Dr. Brown's May 10, 2005, report is contradicted by his office's own records.

Furthermore, other treating sources besides Dr. Brown and Physiatry Medicine contradict the degree of impairment Anders has claimed since her on-the-job injury. These sources include Dr. Liebrecht who, after his examinations revealed no physical explanation for her pain, noted that Anders should have been "substantially improved" by September 2003. (R. at 191-92.) In January 2004, Dr. Liebrecht

-34-

discussed Anders's case with Dr. Griffeth and both doctors concluded that the fact that a spinal block procedure performed on Anders by Griffeth had no impact on her complaints of pain "suggested that there [was] some non-physiological mechanism here, to some extent." (R. at 187.) In February 2004, Dr. Stephenson stated that he felt that "there is evidence of symptom magnification" and "strongly recommended" that Anders return to light duty work to prevent "ongoing debilitation." (R. at 183.) In March 2004, Dr. Liebrecht again noted that he did not "see anything happening here." (R. at 185.) In November 2004, Dr. Surrusco found that Anders's complaints were partially credible and that her treatment for chronic left lower extremity pain had been "essentially routine and conservative in nature." (R. at 216.) In December 2004 and February 2005, Dr. Naveria found Anders to be in no apparent or acute distress. (R. at 250, 254.) Finally, in February 2005, Donovan examined Anders at the request of Dr. Brown and indicated that "Dr. Brown's note indicate[s] that he feels that she can do light duty work, with no lifting over 25 [pounds], and limited walking (allowing sitting breaks)," (R. at 291-92.) As a result, this court finds that, regarding Anders's physicial residual functional capacity, the ALJ's decision is supported by substantial evidence.

With respect to Anders's alleged mental impairment, the claimant again argues that the ALJ's determination is not supported by substantial evidence. Among the claimant's objections are the weight given by the ALJ to Miller's assessment of Anders. (Plaintiff's Brief at 9.) The claimant also objects to the ALJ's decision to give greater weight to the evaluation of Donovan over Miller and the amount of discussion provided by the ALJ regarding Miller's testing of Anders. (Plaintiff's Brief at 9-11.) These arguments are without merit.

It is well-settled that the ALJ has a duty to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). While an ALJ may not reject medical evidence for no reason or for the wrong reason, see *King*, 615 F.2d at 1020, an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his finding. The Fourth Circuit has noted that "circuit precedent does not require a treating physician's testimony 'be given controlling weight;'" moreover, if the opinion "is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig v. Charter*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)).

Furthermore, pursuant to 20 C.F.R. § 404.1527(e)(2), an ALJ is not bound by the findings of any medical source on a claimant's residual functional capacity. Instead, the responsibility for determining a claimant's residual functional capacity rests with the ALJ, and the ALJ can determine the value to give to a medical source's opinions according to the factors listed in 20 C.F.R. § 404.1527(d). *See* 20 C.F.R. § 404.1527(e)(2) (2006).

The court finds that substantial evidence supports the ALJ's findings with regard to Anders's alleged mental impairment. The ALJ found that Anders suffered from an affective disorder that could be considered severe based on the requirements of 20 C.F.R. § 404.1520(c); however, the ALJ also found that the claimant's

Case 1:06-cv-00107-GMW-PMS   Document 16-2   Filed 07/11/07   Page 36 of 41   Pageid#: 99

allegations regarding her limitations were not totally credible and that she had only mild restrictions in activities of daily living. (R. at 24-25.) Furthermore, the ALJ found that the opinions of Miller were not consistent with the record as a whole. (R. at 21.) Instead, the ALJ relied upon the findings of Donovan and other treating sources in the record to conclude that Anders's mental impairment did not result in marked functional limitations. (R. at 21.)

These findings are supported by substantial evidence. In this case, the ALJ's conclusion is supported by the numerous treatment records of various treating sources who consistently found Anders to be alert and oriented with an appropriate mood. These records begin with Dr. Brown's first examination of Anders in May 2004. At this time, he specifically found that she was very pleasant, her mood was normal and her "[c]ognition and memory [were] appropriate [in] affect, actually, at this time in spite of her complaints." (R. at 202.) Furthermore, on October 12, 2004, October 25, 2004, April 11, 2005, May 10, 2005, July 11, 2005, and October 4, 2005, Anders was examined and found to be alert and oriented with an appropriate mood. (R. at 235, 241, 259, 267, 273, 284, 288, 305.)

In May 2005, Anders's depression was diagnosed as "improved." (R. at 268.) On July 11, 2005, Anders was observed walking normally into the doctors office smiling, and, upon examination, she was found to have a mood appropriate to the situation, yet she complained of a decreased mood. (R. at 258-59.) Again, in October 2005, she complained of increased problems with depression, yet she was found to be alert and oriented with a mood appropriate to the situation. (R. at 305.) While Anders again complained of a decrease in mood at her last recorded visit, she was still

-37-

found to be alert and oriented with normal cognition and memory. (R. at 302.)

The only psychologist that examined Anders as a result of a doctor's recommendation was Donovan, who examined Anders on February 7, 2005, at the request of Dr. Brown. (R. at 290-93.) Donovan found her to be alert and oriented with a mildly depressed mood and a flexible affect. (R. at 292.) Anders was cooperative and no evidence of a formal thought disorder was found. (R. at 292.) Her attention was found to be good and no memory deficits were noted. (R. at 292.) Donovan gave Anders a GAF score of 60 and administered the BDI-II, on which Anders scored in the moderate range. (R. at 290, 293.) Donovan made no findings that Anders was in any way disabled by this mental impairment or that it would have any impact on her ability to work. In fact, Donovan's notes indicate that Anders's functional impairments stemmed from her complaints of pain not from mental problems. (R. at 291.) Donovan also noted that Anders was still independent in her activities of daily living and was able to carry out errands and perform housework. (R. at 291.)

The evaluations of state agency psychologists Milan and Tension also diagnosed Anders as suffering from an affective disorder, namely depression, but found that this disorder did not impact her ability to work. (R. at 219-31.) Milan and Hays specifically noted that Anders had no limitations in her activities of daily living, maintaining social functioning, maintaining concentration, maintaining persistence or maintaining pace. (R. at 229.) Anders, in her own testimony, even indicated that she was able to take care of her own personal needs. (R. at 336.)

As a result, this court finds that the ALJ's decision that Anders's mental impairment was severe, but not disabling, is supported by substantial evidence including the records of Physiatry Medicine, Dr. Brown, Donovan, Milan and Tension. The court finds that the ALJ properly weighed and sufficiently explained his rationale in making his decision to place less weight on Miller's assessment.

Anders also objects to the ALJ's statements and characterizations of Miller's report. Specifically, Anders objects to the ALJ's statements that he "puts little weight into the assessment of Miller," because "[t]his evaluation was done at the behest of her attorney in hopes of helping the claimant obtain disability." (Plaintiff's Brief at 9.) However, pursuant to 20 C.F.R. § 404.1527(d), in making determinations regarding the weight to be placed on a source's opinion, the ALJ may consider a number of factors including the duration of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the findings and the consistency with the record. *See* 20 C.F.R. § 404.1527(d) (2006). As a result, the ALJ's statements in this case are a reflection of a proper analysis of relevant factors to be considered in evaluating the context surrounding a source's opinion pursuant to the Social Security Regulations.[17]

Anders's final argument is that the Commissioner has not met his evidentiary

---

[17] Anders also objects to the distinction made by the ALJ with respect to the credentials of Miller and Donovan. (Plaintiff's Brief at 9-10.) While the ALJ was correct that Donovan had a Ph.D. and Miller had a Ed.D., the court agrees with Anders that the ALJ was incorrect that Donovan was a licensed clinical psychologist and Miller was not. However, the ALJ stated that the primary reason for rejecting Miller's opinion was that Miller's conclusions were inconsistent with the record as a whole. (R. at 21.) As a result, this court notes that this harmless error has no impact on the fact that the ALJ's opinion is otherwise supported by substantial evidence.

-39-

burden to identify jobs consistent with the claimant's age, education and work history. (Plaintiff's Brief at 5.) More specifically, the claimant argues about the evidence presented to the vocational expert regarding Anders's alleged mental impairment. (Plaintiff's Brief at 11-13.)

Testimony of a vocational expert constitutes substantial evidence for purposes of review where his or her opinion is based upon a consideration of all the evidence of records and is in response to a proper hypothetical question which fairly sets out all of the claimant's impairments. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). The determination of whether a hypothetical question fairly sets out all of a claimants impairments turns on two issues: first, whether the ALJ's finding as to the claimant's residual functional capacity supported by substantial evidence; and second, whether the hypothetical adequately set forth the residual functional capacity as found by the ALJ.

As discussed by the analysis above, the ALJ's determination with regards to Anders's residual functional capacity is supported by substantial evidence. Thus, the only remaining inquiry is whether the ALJ's hypothetical fairly set forth the residual functional capacity. At Anders's hearing, the vocational expert was asked to assume a hypothetical individual with Anders's age, education and work background, who was restricted to a full range of sedentary work. (R. at 341.) The vocational expert found that such an individual could perform several sedentary, unskilled jobs that existed in significant numbers in the national economy. (R. at 341-42.) The ALJ next asked the vocational expert if the individual could still perform these jobs if the individual suffered from a degree of depression that would still allow them to perform

-40-

their job satisfactorily.  (R. at 344.)  The vocational expert indicated that this would not impact the individual's job prospects.  (R. at 344.)

The ALJ in his opinion found Anders to have the ability to perform sedentary work with some limitation in her ability to concentrate due to medications and depression, but with the ability to perform her job duties satisfactorily.  (R. at 25.) Thus, the hypothetical questions presented to the vocational expert did fairly represent the residual functional capacity found by the ALJ.  As a result, the testimony of the vocational expert constitutes substantial evidence for purposes of review by this court. *See Walker*, 889 F.2d at 50.

## IV.  Conclusion

For the foregoing reasons, the plaintiff's motion for summary judgment will be overruled and the Commissioner's motion for summary judgment will be sustained.

An appropriate order will be entered.

**DATED:** This ⁄⁄⁊ day of July 2007.

_____
THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE

Case 1:06-cv-00107-GMW-PMS   Document 16-2   Filed 07/11/07   Page 41 of 41   Pageid#: 104